IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Shelly Clark,                                                     Case No. 3:15CV2272

        Plaintiff

   v.                                                          **ORDER**

Pekin Insurance Co.,

        Defendant

       This is an insurance-coverage dispute.

       The plaintiff, Shelly Clark, had a homeowner's policy with the defendant, Pekin Insurance Company. During a storm in 2012, a tree fell on Clark's home and damaged the roof. Clark notified Pekin, and within two months the company had inspected Clark's home twice and paid her roughly $12,000 for damages to the roof.

       The parties could not agree, however, on the extent of damage to the home's interior. To resolve the dispute, Clark invoked the policy's appraisal provision. Under that provision, two appraisers would make an estimate of Clark's covered damages. If they could not agree, an umpire whom the appraisers selected would issue a decision that "set[s] the amount of the loss." (Doc. 12–3 at 33).

       When the appraisers could not agree, the umpire ruled in Clark's favor. Pekin immediately paid Clark the full amount of the appraisal award.

Clark then filed this suit, alleging Pekin breached the insurance contract, acted in bad faith, and breached its fiduciary duties to her.

Jurisdiction is proper under 28 U.S.C. § 1332(a)(1).

Pending is Pekin's motion for summary judgment. (Doc. 12). For the following reasons, I grant the motion.

**Background**

Three days after Clark notified Pekin of the damage to her roof (which had occurred two days earlier), Ryan Harker, a Pekin claims adjuster, visited Clark's home. Clark identified all areas of the house that the storm had damaged, and Harker inspected each area. On July 6, Pekin paid Clark $8,891.69. (Doc. 12–2 at ¶10).

Clark, acting on her own and without input from Pekin, hired Tim Slusher, a contractor, to make the repairs. Slusher estimated that it would cost $12,085 to fix Clark's roof and repair the interior of her home. On July 17, after receiving Slusher's estimate, Pekin paid Clark an additional $1,510. (*Id.* at ¶14).

Slusher began the repairs on July 24.

While removing the old roof, Slusher discovered that one of the attic rafters was broken and three more were cracked. Nevertheless, Slusher did not report his discovery to Clark until after he had "roofed over" the damaged rafters. (Doc. 12–1 at 9).

Clark contacted Pekin about the damaged rafters on July 25. The company hired an engineering firm, Donan Engineering, to evaluate the situation. Donan conducted an inspection on August 3 and prepared a report on August 14. Several days after Pekin received Donan's report, it paid Clark an additional $1,668.49. (Doc. 12–2 at ¶15).

2

Clark disagreed with Donan's conclusion that much of the interior damage to her home predated the June storm. She therefore hired Larry Fast, a forensic engineer, to help make the case Pekin was liable for this damage. Fast inspected the home and, on February 1, 2013, provided his report to Pekin. Pekin then sent Fast's report to Donan Engineering. On February 22, 2013, Donan issued a supplemental report rejecting Fast's conclusions. (*Id.* at ¶17).

In early April, Clark told Pekin that she had hired another contractor, Paul Davis Restoration Company, to inspect her home. According to Paul Davis's report, Pekin was liable for nearly $33,000 in damages to the home's interior. Pekin received this report on June 7, 2013. (*Id.* at ¶19).

Twelve days later, Pekin sent Jordan Mast, a claims adjustor, to inspect Clark's home. On July 3, and in light of Mast's inspection, Pekin issued Clark another check, for $4,193.28. (*Id.* at ¶21). However, Pekin denied that it was liable for the remainder of the damage to the home's interior.

There the matter stood until September 10, 2013, when Clark, via counsel, invoked her insurance policy's appraisal provision.

The appraisers whom Clark and Pekin chose could not agree. On June 11, 2014, the umpire found for Clark, ruling that she was entitled to $26,584.66. (Doc. 12–6 at 1). The umpire's award stated that it "shall be valid and binding upon all parties concerned[.]" (*Id.* at 2).

On June 13, Pekin issued Clark a check for $26,084.66 – the full amount of the award, less the policy's $500 deductible. (Doc. 12–2 at ¶25). "As a professional courtesy," moreover, "Pekin did not deduct the additional $1,050.77 in recoverable depreciation that it was entitled to deduct from the award." (*Id.* at ¶26).

3

Three days later, Clark sued Pekin in the Common Pleas Court of Putnam County, Ohio. She alleged, *inter alia*, that Pekin breached the insurance contract, acted in bad faith in processing her claim, and breached its fiduciary duties to her.

In that action, Pekin sought summary judgment on grounds that Clark's invocation of the appraisal process foreclosed her from recovering, *via* a lawsuit, any additional damages from Pekin. The trial court denied the motion.

On Clark's motion, the court continued the August, 2015 trial date to November, 2015. When Clark sought a second continuance (due to her expert witness's unavailability), and the court indicated it would not grant her request, Clark voluntarily dismissed the state-court suit without prejudice under Ohio R. Civ. P. 41(A)(1). Clark refiled suit in Putnam County roughly two weeks later, and Pekin removed the case to this court on the basis of diversity jurisdiction.[1]

In the refiled complaint, Clark renews her allegations that Pekin: 1) breached the insurance contract by "refusing to pay insurance benefits to [her]"; 2) acted in bad faith by "refus[ing] to process the claim pursuant to the terms of the relevant insurance contract" and by "refusing to investigate, adjust and fairly pay" her claim; and 3) breached its fiduciary duties to her "by failing to honor the insurance policy terms and failing to investigate, adjust and fairly pay" her claim. (Doc. 1–1 at 2–3).

## Discussion

Summary judgment is appropriate under Fed. R. Civ. P. 56 where the opposing party fails to show the existence of an essential element for which that party bears the burden of proof. *Celotex*

---

[1] Clark had named Slusher and a bank as additional defendants in the original suit. After settling with them, Clark dismissed them from the suit. Presumably one of these defendants was an Ohio citizen, thus precluding Pekin from removing the first suit to federal court.

*Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The movant must initially show the absence of a genuine issue of material fact. *Id.* at 323.

Once the movant meets that burden, the "burden shifts to the nonmoving party [to] set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and submit admissible evidence supporting its position. *Celotex*, *supra*, 477 U.S. at 324.

I accept the non-movant's evidence as true and construe all evidence in its favor. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992).

### A. Appraisal Process

Pekin argues that Clark's decision to submit her claim to the appraisal process and the umpire's determination of her loss bar her from recovering further damages in this suit.

According to Pekin, Clark's insurance policy provides that, if Clark submits a disputed claim to the appraisal process, the appraisers' or umpire's decision stands as the final and binding amount of her loss. Because Clark initiated the appraisal process, won a favorable ruling, and received full payment from Pekin, the company argues that Clark is not entitled to, and cannot recover, any additional damages.

Clark offers three responses.

First, she contends that "the appraisal award has no application to [this] refiled case." (Doc. 21 at 2). This is so, Clark argues, because the dismissal of her first Putnam County suit "nullif[ied] the appraisal award's application to [this] refiled lawsuit." (*Id.* at 3).

Second, Clark alleges the insurance policy is ambiguous as to whether the appraisal award "precludes further litigation concerning breach of the insurance contract and bad faith." (*Id.* at 8).

5

Third, and in any event, Clark argues that the appraisal award does not foreclose her bad-faith claim because that claim "can be established without proving breach of the insurance contract[.]" (*Id.*).

### 1. Effect of the Voluntary Dismissal

As Clark concedes, a voluntary dismissal without prejudice "leaves the parties in the same legal position they were as if the original action were never filed." (Doc. 21 at 3).

After a voluntary dismissal under Ohio R. Civ. P. 41(A)(1), "[p]laintiffs are free to commence another action against" the same parties. *Cent. Mut. Ins. Co. v. Bradford-White Co.*, 35 Ohio App. 3d 26, 28 (Ohio App. 1987). However, "the dismissal of an action without prejudice, whether voluntary or involuntary, dissolves all orders rendered by the trial court during the pendency of the action." *Id.*; *see also Nielsen v. Firelands Rural Elec. Coop., Inc.*, 123 Ohio App. 3d 104, 106 (Ohio App. 1996) ("a voluntary dismissal, without prejudice, dissolves all interlocutory orders made the court in that action, including a partial summary judgment") (internal quotation marks omitted).

In light of these principles, there is no merit to Clark's contention that her dismissal of the first suit "nullif[ied] the appraisal award's application to [this] refiled lawsuit." (Doc. 21 at 3).

Clark and Pekin submitted to the appraisal process in September, 2013, long before there was a state-court suit for Clark to dismiss. The dismissal, far from nullifying that process, simply left Clark and Pekin in *status quo ante*: Clark had sought and won, and Pekin had paid, an appraisal award.

Moreover, the voluntary dismissal wiped out all of the Putnam County court's rulings, including its denial of Pekin's summary-judgment motion. That ruling, in which the trial court apparently concluded the appraisal award did not foreclose Clark's claims, has no preclusive effect

6

here and is no basis for concluding the appraisal award is a nullity. *Nielsen*, *supra*, 123 Ohio App. 3d at 106.

Finally, and most fundamentally, the appraisal process and the award Clark obtained are creatures of contract, not the Putnam County litigation. It is Clark's homeowner's policy, rather than any order the Common Pleas Court issued, that spells out the appraisal process, defines the parties' rights and obligations, and bound both sides to accept the umpire's decision. That being so, the dismissal of the first suit simply has no adverse bearing on the award's validity.

### 2. Effect of Clark's Invocation of the Appraisal Process

The critical question is what effect Clark's decision to resolve her disputed claim *via* the appraisal process has on her claims for breach of contract and breach of fiduciary duty.

The crux of these claims is that Pekin failed to pay and process Clark's insurance claim in accordance the policy's terms.

Pekin argues that the policy unambiguously bars an insured who submits her claim to the appraisal process from recovering damages beyond those reflected in the award. Because Clark invoked the process, and Pekin paid her the full amount of the umpire's award, it argues no reasonable jury could find that it breached either the contract or its fiduciary duty to Clark.

Clark responds that the policy is ambiguous because it does not specify whether "policy holders can proceed with a lawsuit to seek additional redress after an appraisal award is paid." (Doc. 21 at 2).

"An insurance policy is a contract whose interpretation is a matter of law." *Cincinnati Ins. Co. v. CPS Holdings, Inc.*, 115 Ohio St. 3d 306, 307 (2007).

7

"The fundamental goal when interpreting an insurance policy is to ascertain the intent of the parties from a reading of the policy in its entirety[.]" *Laboy v. Grange Indem. Ins. Co.*, 144 Ohio St. 3d 234, 236 (2015). An insurance contract is ambiguous if it is "susceptible to more than one reasonable interpretation." *Miller v. Motorists Mut. Ins. Co.*, 196 Ohio App. 3d 753, 757 (2011).

Section E of Clark's policy establishes the appraisal policy:

> **E.    Appraisal**
>
> If you and we fail to agree on the amount of the loss, either may demand an appraisal of the loss. In this event, each party will choose a competent and impartial appraiser within 20 days after receiving a written request from the other. The two appraisers will choose an umpire. If they cannot agree within 15 days, you or we may request that the choice be made by a judge of a court of record in the state where the "residence premises" is located. The appraisers will separately set the amount of loss. If the appraisers submit a written report of an agreement to us, the amount agreed upon will be the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will set the amount of the loss.

(Doc. 12–3 at 33).

Contrary to Clark's claims, there is nothing ambiguous about this provision or the appraisal award's effect on her ability to obtain damages beyond those the umpire granted her.

Section E governs the situation in which Clark found herself: she and Pekin "fail[ed] to agree on the amount of loss" the falling tree caused to the interior of her home. (*Id.*).

The policy gave Clark the right to resolve that dispute by "demand[ing] an appraisal of the loss" (*id.*), and Clark exercised that right. Thereafter, she and Pekin each selected an appraiser, and the appraisers selected an umpire. The policy then explained that, should the appraisers disagree over the damages she sustained, "[a] decision agreed to by any two" – i.e., the umpire and either appraiser – "will set the amount of the loss." (Doc. 12–3 at 33).

8

In short, then, the insurance policy obligated Pekin to pay, and entitled Clark to receive, only the "amount of the loss" reflected in the umpire's award. Because there is no dispute Pekin paid Clark the full amount of that award, no reasonable jury could find that Pekin breached either the insurance contract or its fiduciary duty to Clark.

Clark's arguments to the contrary are unconvincing.

First, the policy is not ambiguous merely because it omits the phrase "an insured may not proceed with a lawsuit to seek additional redress after an appraisal award is paid." After all, the import of Section E is to define Clark's loss as the amount reflected in the appraisal award and no more.

Second, the supposed "admission" of Pekin employee Jason Dever that the contract does not forbid Clark from recovering post-appraisal damages in court is irrelevant.

Ohio law gives courts – and not Dever or, for that matter, Clark, who has submitted an affidavit reflecting her understanding of the policy's disputed language – the authority to interpret an insurance contract. *Cincinnati Ins. Co.*, *supra*, 115 Ohio St. 3d at 307. In any event, Dever resisted opposing counsel's effort to force an admission that the policy was ambiguous. (Doc. 21–1 at 7–14).

In sum, the policy states that Clark, by submitting her disputed claim to the appraisal process, agreed that the umpire's decision would "set the amount of the loss," and thus the amount of damages Pekin had to pay.

Her decision to invoke that process, and the fact that Pekin paid the award in full, precludes her from showing a genuine dispute of material fact as to Pekin's alleged breach of the contract or its fiduciary duty to her. Pekin is therefore entitled to summary judgment on those claims.

### 3. Viability of the Bad-Faith Claim

Clark contends that, the appraisal provision notwithstanding, she can pursue a bad-faith claim against Pekin. This is so, she maintains, because "a bad faith insurance claim is a separate tort claim that an insured can pursue against an insurance company regardless if the insurance company pays the claim." (Doc. 21 at 9).

Pekin's reply brief does not address this argument, but I agree with Clark that the appraisal award does not preclude her from proceeding with a bad-faith claim.

The appraisal process and the bad-faith tort have different objects. The former aims to resolve disputed damages claims in an efficient and somewhat informal manner. *E.g.*, *Smith v. Shelby Ins. Grp.*, 1997 WL 799512, *4 (Ohio App.). The latter aims to punish an insurer that acts improperly during the claims process even if, in the end, it pays the claim. *E.g.*, *Staff Builders, Inc. v. Armstrong*, 37 Ohio St. 3d 298, syll. ¶1 (1988); *McNair v. State Farm Fire & Cas. Co.*, 2013-Ohio-5625, ¶24 (Ohio App.).

Accordingly, Pekin's payment of the appraisal award does not, as a matter of law, foreclose the possibility that Pekin acted in bad faith in resolving Clark's claim.

### B. Bad-Faith Claim

Clark's complaint alleges Pekin acted in bad faith "by refusing to investigate, adjust and fairly pay" her claim[.]" (Doc. 1–1 at ¶12). In her opposition to Pekin's summary-judgment motion, however, Clark cites no evidence to support those allegations. (*See* Doc. 21 at 9–11). Nor does Clark point to any acts on Pekin's part that purportedly demonstrate its bad-faith handling of her claim. (*See id.*).

Clark's brief does make two references to the fact that Pekin did not pay the appraisal award until "nearly two (2) years after Plaintiff Clark made [a] property loss claim to Pekin[.]" (*Id.* at 9, 10). Clark then asserts that "Pekin has failed to meet its burden it acted in good faith when processing Plaintiff Clark's insurance claim[.]" (*Id.* at 10).

Pekin responds that no reasonable jury could find that it acted in bad faith. It points to considerable evidence of its good faith: its multiple inspections of Clark's home, the timeliness with which it paid Clark, its participation in the appraisal process, and its full payment of the umpire's award. It also contends that, to the extent delays occurred during the appraisal process, Clark herself is responsible for most of those delays.

"An insurer has the duty to act in good faith in the handling and payment of the claims of its insured." *McNair*, *supra*, 2013-Ohio-5625, at ¶24. "A breach of this duty will give rise to a cause of action against the insured." *MPDS Memphis Ltd. v. State Farm Fire & Ins. Co.*, 526 F. App'x 459, 463 (6th Cir. 2013).

"An insurer fails to exercise good faith in the processing of a claim of its insured where its refusal to pay the claim is not predicated upon circumstances that furnish reasonable justification therefor." *Swan v. Safeco Ins. Co. of Am.*, 2016 WL 2944117, *5 (N.D. Ohio) (Nugent, J.). "An insurer lacks reasonable justification when it denies an insured's claim in an arbitrary and capricious manner." *Id.*

"Even where a claim is ultimately paid, the insurer's 'foot-dragging' in handling and evaluating the claim may support a bad-faith cause of action." *McNair*, *supra*, 2013-Ohio-5625, at ¶24; *see also Mundy v. Roy*, 2006-Ohio-993, ¶9 (Ohio App.) (insurer's "excessive delay before authorizing a settlement" could support bad-faith claim).

"However, to recover on a bad faith claim relating to delay, an insured must put forth evidence that the claim was unreasonably delayed and the insurer had no justification for such delay." *Vargo v. State Auto Mut. Ins. Co.*, 2011 WL 31116, *10 (N.D. Ohio) (Lioi, J.) (internal alterations and quotation marks omitted).

Contrary to Clark's claim, there is no evidence on which a reasonable jury could find that Pekin acted in bad faith.

Within three days of the tree falling on Clark's roof, a Pekin claims adjuster was at Clark's house to inspect the damage. Three days after that, Pekin had issued its first check to Clark. When Pekin received a repairs estimate from Slusher, the contractor whom Clark hired to fix the roof, Pekin adjusted its initial estimate upwards and sent Clark another check. When Pekin learned about the broken and damaged attic rafters, it promptly conducted another inspection and made another payment. Finally, after Clark had hired a second contractor to repair her roof, Pekin made yet another payment.

To be sure, the course of dealings shows that Pekin often disagreed with Clark's estimate of the loss. But "a disagreement about the value of a claim does not generate a genuine issue of material fact as to bad faith." *Eagle Am. Ins. Co. v. Frencho*, 111 Ohio App. 3d 213, 223 (1996).

Nor is there any evidence of "'foot-dragging' in handling and evaluating the claim" once Clark invoked the appraisal process. *McNair*, *supra*, 2013-Ohio-5625, at ¶24.

Clark invoked the process on September 10, 2013. Within a month, it appears, both sides had selected their appraisers, and sometime thereafter the appraisers chose the umpire. Although the umpire did not make his decision until June, 2014, there is no evidence in the record indicating what transpired in the intervening eight months or why the umpire did not rule sooner. There certainly is

no evidence that Pekin alone is responsible for the delay or that the company's conduct amounted to unreasonable delay.

Thus, Clark has not met her burden to show a disputed issue of fact as to the alleged unreasonable delay between the start and finish of the appraisal process. *E.g.*, *Price v. Dillon*, 2008-Ohio-1178, ¶35 ("A seven-month delay in paying an insurance claim, without more, is not evidence of bad faith.").

What the record shows is that when the umpire ruled for Clark, Pekin paid the full amount of the reward within two days. Indeed, Pekin did not, though it was entitled to do so, deduct from the award the recoverable depreciation.

In these circumstances, there is simply no evidence on which a reasonable jury could return a bad-faith verdict for Clark. Pekin is, therefore, entitled to summary judgment on the bad-faith claim.

## Conclusion

It is, therefore,

ORDERED THAT: Pekin's motion for summary judgment (Doc. 12) be, and the same hereby is, granted.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge